1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

11

SOUTHERN DISTRICT OF CALIFORNIA

12

| | | |
|---|---|---|
| 13 | RUTH MILANO, ) | Case No. 09-cv-2469-L(BLM) |
| 14 | Plaintiff, ) | **ORDER GRANTING** |
| 15 | v. ) | **DEFENDANT'S MOTION FOR** **SUMMARY JUDGMENT [DOC. 41]** |
| 16 | ROLONDO AGUILERRA, *et al.*, ) | |
| 17 | Defendants. ) | |

18      On November 4, 2009, Plaintiff Ruth Milano commenced this sexual-harassment action

19   against Defendants Rolondo Aguilerra, also known as "Jay" Aguilar, United States Department

20   of Defense, and Robert M. Gates, Secretary of Defense.[1]  Defendant Leon E. Panetta, Secretary

21   of Defense, now moves for summary judgment.  Plaintiff opposes.

22      The Court found this motion suitable for determination on the papers submitted and

23   without oral argument.  *See* Civ. L.R. 7.1(d.1).  (Doc. 44.)  For the following reasons, the Court

24   **GRANTS** Defendant's motion for summary judgment.

25

26      ─────────────

27      [1] Mr. Aguilera's name was incorrectly spelled in the First Amended Complaint ("FAC"). (Def.'s Mot. 2 n.1.)  Also, Leon E. Panetta was sworn in as the Secretary of Defense after the commencement of this action, and thus is automatically substituted in as defendant for Robert M. Gates.  Fed. R. Civ. P. 25(d)(1).

28

# I.     BACKGROUND

Plaintiff alleges that on August 24, 2008, her co-worker Mr. Aguilera sexually assaulted her earlier that morning in the women's locker room at the San Diego Naval Base Commissary. (FAC ¶¶ 12–15.)  Plaintiff, a cashier at the commissary, was three months pregnant and had been temporarily assigned to work in the produce department. (Milano Dep. 18:20–19:1–5, 33:21–23.) On the date of the incident, Mr. Aguilera held the position of Quality Assurance Evaluator ("QAE"). (Vick Decl. ¶ 3.) Mr. Aguilera's "primary duty as a QAE was to monitor the performance of independent contractors of the commissary with regard to stocking and custodial services." (*Id.*) While on duty at night, Mr. Aguilera "acted as the commissary manager's representative" but "had no supervisory or other authority over any other commissary employee." (*Id.* ¶ 4)

On August 24, 2008, at approximately 5:00 A.M., Plaintiff arrived at the commissary for work. (Milano Dep. 16:16–22.) When Plaintiff arrived, no other commissary managers were on-site, which meant that Mr. Aguilera was in charge of the store. (Vick Dep. 36:6–15.) Plaintiff saw Mr. Aguilera at the employee entrance, greeted him, and walked upstairs with him to the women's locker room. (Milano Dep. 16:21–18:19.) While they walked, they engaged in "a regular, friendly conversation." (*Id.* at 40:9–12.)

Mr. Aguilera had entered the lounge room in front of Plaintiff, and they entered the women's locker room together. (Aguilera Dep. 81:12–18, 86:2–4.) Plaintiff walked over to her locker and sat in a chair to put on her work boots while Mr. Aguilera sat in a chair beside the locker room's entrance. (Milano Dep. 30:2–31:1–7, 41:9–14; Aguilera Dep. 81:12–16.) Plaintiff alleges that Mr. Aguilera looked down her shirt while she put on her boots; Defendant denies this. (Milano Dep. 41:11–14; Aguilera Dep. 94:3–8.) Plaintiff then used her sweatshirt to cover her chest. (Milano Dep. 42:2–8.) After she stood up, Plaintiff put on her jacket and then her smock. (*Id.* at 46:7–24.)

After Plaintiff was ready for work, she walked toward the center of the locker room, and Mr. Aguilera did the same. (Milano Dep. 48:5–12.) Plaintiff alleges that as Mr. Aguilera walked toward her, he said something to the effect of "let me see if you have milk in there [her

09cv2469

breasts].” (*Id.* at 48:13–15.)  Mr. Aguilera then allegedly reached for Plaintiff’s breast to which Plaintiff responded, “what are you doing?  Are you serious?” (*Id.* at 51:25–52:2.)  Mr. Aguilera allegedly said, “I want to see if you have milk in there,” to which Plaintiff responded, “Are you serious?  I don’t have milk in there yet.” (*Id.* at 62:8–20.)  Plaintiff then used her forearms to cover her chest, but Plaintiff reached through her arms and touched the part of her skin located about one inch above the top of her shirt.  (*Id.* at 53:8–11, 59:22–24, 61:2–12.)  Plaintiff states that she did not push Mr. Aguilera away from her, as she was “in shock” and worried about what would happen to her unborn baby if she objected.  (*Id.* at 57:18–21, 63:14–19.)  After Mr. Aguilera removed his hand from Plaintiff’s body, he allegedly said, “let me take a picture of you,” picked up her shirt “to try to get the garter part of my pants down more,” and then took a picture of her stomach.  (*Id.* at 65:13–15, 66:2–3, 71:5–6.)

Mr. Aguilera contends that Plaintiff consented to him taking the photograph following a conversation regarding her sonogram and Mr. Aguilera’s suggestion that she make a scrapbook containing pictures of herself at various stages of her pregnancy.  (Aguilera Dep. 71:6–72:18.)  Plaintiff had previously told Mr. Aguilera about her pregnancy.  (*Id.* at 69:21–24.)  Mr. Aguilera denies that he touched Plaintiff and denies that he made statements regarding her breasts.  (*Id.* at 112:14–113:4.)  Plaintiff and Mr. Aguilera left the locker room together and walked down the stairs together with Mr. Aguilera leading the way.  (Milano Dep. Ex. 10, 11.)

Twenty to thirty minutes after Mr. Aguilera took the photograph, Plaintiff told a co-worker what had happened, and the co-worker suggested that she inform a supervisor immediately.  (Milano Dep. 85:7–20.)  Around 8:30 A.M., Plaintiff reported the incident to Mr. Vick, the store director, who advised Plaintiff to call the military police, as the commissary has a zero-tolerance sexual-harassment policy.  (*Id.* at 85:12–24, 87:19–24; Vick Dep. 36:16–20.)  Plaintiff called the military police, which resulted in an investigation by the Criminal Investigation Division (“CID”).  (Milano Dep. 87:22–88:5.)

While the CID’s investigation was in progress, Mr. Vick transferred Mr. Aguilera to the Imperial Beach Commissary.  (Vick Decl. ¶ 5.)  After the investigation came back unfounded, Mr. Aguilera was transferred back to the 32nd Street Commissary.  (*Id.*)  Soon after his return,

09cv2469

1   Mr. Aguilera applied for a position at the Imperial Beach Commissary, which he received and

2   which Plaintiff contends constituted a promotion, including a pay raise and an increase in his

3   wage grade. (*Id.*; Pl.'s Opp'n 19:18–27.)

4       On November 24, 2008, Mr. Aguilera's supervisor, Mr. Barcelona, issued Mr. Aguilera a

5   "letter of concern" regarding the incident. (Def.'s Ex. 8.) Mr. Vick and Mr. Barcelona decided

6   that the letter was the appropriate action to take because the investigation had come back

7   unfounded. (Vick Decl. ¶ 7.) The letter warned Mr. Aguilera that "future infractions may result

8   in more sever[e] disciplinary action." (Def.'s Ex. 8.) On January 10, 2009, Mr. Aguilera

9   completed training on the prevention of sexual harassment. (Pl.'s Ex. 3–1.)

10      Plaintiff claims that she experienced retaliation as a result of her EEO complaint. First,

11   she alleges that Defendant's action of moving her from the produce department back to her

12   position as a cashier around October 2008 constituted retaliation. (Milano Dep. 120:3–14,

13   121:22–122:3.) Plaintiff claims that she did not want to return to her cashier position because it

14   is a "hostile environment" in general, as the cashiers are unable to eat, drink, or socialize. (*Id.* at

15   120:18–121:6.)

16      Second, Plaintiff alleges that her supervisor Ms. Mina's refusal to provide her with a

17   footstool while at the cash register constituted retaliation. Plaintiff asked Ms. Mina if she could

18   sit on a stool between customers while at the cash register. (Milano Dep. 127:5–9.) In response,

19   Ms. Mina asked Plaintiff to provide her with a doctor's note. (*Id.* at 127:10–12.) Plaintiff

20   provided Ms. Mina with a note from a nurse practitioner dated October 10, 2008, in which the

21   nurse practitioner recommended that Plaintiff have a foot stool for her use if she is standing. (*Id.*

22   at 127:13–20; Pl.'s Ex. 12.) Ms. Mina told Plaintiff that using a stool at a cash register was

23   dangerous because she might trip over it. (Milano Dep. 129:14–18.) She then offered to move

24   Plaintiff to Cash Register 21, a handicap register that is wider and could accommodate Plaintiff's

25   use of a stool. (*Id.* at 129:21–25.) Ms. Mina provided Plaintiff with the stool. (*Id.* at 130:1–7.)

26   Plaintiff then submitted a reasonable accommodation request through her union in November

27   2008 in which she requested a "stable chair with back support." (*Id.* at 133:21–24, 134:22–24,

28   Ex. 21.) Plaintiff does not recall if there was any response to her request. (*Id.* at 137:14–16.)

09cv2469

Ms. Mina asked Plaintiff to get a second doctor's note indicating the type and dimensions of the chair that she needed.  (*Id.* at 137:17–21.)  Plaintiff provided a second doctor's note.  (*Id.* at 141:17–22.)  In response, Ms. Mina offered Plaintiff the position of ID checker, which would allow Plaintiff to sit.  (*Id. at* 143:10–13.)  But Plaintiff declined the assignment because the position would not afford her the overtime that she received as a cashier.  (*Id.* at 144:8–16.)  In the end, Plaintiff grabbed a small plastic chair from the deli section, which she used at her cash register.  (*Id. at* 138:8–15.)  No one had a problem with Plaintiff's action, and this action resolved the situation to her satisfaction.  (*Id.* at 138:16–21.)

Third, Plaintiff alleges that after filing her EEO complaint, Defendant "started nitpicking every little thing" and placed a "spotlight" on her.  (Milano Dep. 154:4–6, 155:2–6.)  Ms. Mina gave Plaintiff a write-up after catching her on video talking to a bagger and leaning on the register.  (*Id.* at 155:9–20, 156:2–4.)  Plaintiff believes that this discipline was a result of her EEO activity because "[t]here were other cashiers who were also doing the same thing I was doing, but didn't get a write-up."  (*Id.* at 156:14–22.)  A commissary directive prohibits cashiers from talking with baggers, and requires written documentation of first-time violations.  (Mina Dep. 40:2–43:6.)  In terms of having the spotlight on her, Plaintiff claims that before providing Ms. Mina with her doctor's note, she had been assigned to the cash registers that received the most customers.  (Milano Dep. 157:24–25, 159:11–13.)  However, Plaintiff does not recall complaining about this, and it took place three or four times.  (*Id.* at 158:12–13, 160:7–8.)  Plaintiff also claims that if she left her register without letting anyone know, someone would come looking for her.  (*Id.* at 160:12–17.)

In her complaint, Plaintiff asserted five claims: (1) sexual harassment, (2) sexual assault and battery, (3) retaliation/reprisal, (4) spoliation of evidence, and (5) negligent hiring, training, retention, and supervision.  (Doc. 1.)  Thereafter, the Court dismissed with prejudice Mr. Aguiler and the United States Department of Defense from this action.  On February 26, 2011, Plaintiff filed the operative FAC, alleging four claims: (1) sexual harassment, (2) sexual assault and battery, (3) retaliation/reprisal, and (4) negligent hiring, training, retention, and supervision.  (Doc. 21.)  In the FAC, Plaintiff proceeds solely under Title VII with no mention of any claims

09cv2469

1  under the Federal Tort Claims Act ("FTCA").  The only remaining defendant is Leon E. Panetta,
2  Secretary of Defense, who now moves for summary judgment.  Plaintiff opposes.

3

4  **II.   LEGAL STANDARD**

5       Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates
6  the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.
7  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material
8  when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v.*
9  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.
10 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury
11 could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

12      A party seeking summary judgment always bears the initial burden of establishing the
13 absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can
14 satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of
15 the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a
16 showing sufficient to establish an element essential to that party's case on which that party will
17 bear the burden of proof at trial.  *Id.* at 322-23.  "Disputes over irrelevant or unnecessary facts
18 will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*
19 *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

20      "The district court may limit its review to the documents submitted for the purpose of
21 summary judgment and those parts of the record specifically referenced therein."  *Carmen v. San*
22 *Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not
23 obligated "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allen*, 91
24 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251
25 (7th Cir. 1995)).  If the moving party fails to discharge this initial burden, summary judgment
26 must be denied and the court need not consider the nonmoving party's evidence.  *Adickes v. S.H.*
27 *Kress & Co.*, 398 U.S. 144, 159-60 (1970).

28 //

09cv2469

1    If the moving party meets this initial burden, the nonmoving party cannot defeat summary

2    judgment merely by demonstrating "that there is some metaphysical doubt as to the material

3    facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);

4    *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence

5    of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing

6    *Anderson*, 477 U.S. at 242, 252).  Rather, the nonmoving party must "go beyond the pleadings"

7    and by "the depositions, answers to interrogatories, and admissions on file," designate "specific

8    facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R.

9    Civ. P. 56(e)).

10   When making this determination, the court must view all inferences drawn from the

11   underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at

12   587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate

13   inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on

14   a motion for summary judgment." *Anderson*, 477 U.S. at 255.

15

16   **III.   DISCUSSION**

17      **A.   Sexual Harassment/Sexual Assault and Battery**[2]

18   Title VII prohibits employment discrimination on a number of enumerated grounds

19   including "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Brooks v.*

20   *City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).  Sexual harassment is a type of gender

21   discrimination and courts recognize two categories of harassment under Title VII: quid pro quo

22   and hostile work environment. *Brooks*, 229 F.3d at 923.  "In 'quid pro quo' cases, employers

23   condition employment benefits on sexual favors." *Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir.

24

25   _____

     [2] The Court did not dismiss Plaintiff's sexual-assault claim under the FTCA in its entirety.

26   (Doc. 18.)  However, Plaintiff proceeds solely under Title VII in her FAC.  In its summary-
     judgment motion, Defendant addresses both the sexual harassment and assault together because

27   Plaintiff proceeds only under Title VII, and because both claims arise out of the same conduct.
     Plaintiff makes no attempt to clarify her claim for sexual assault and battery in her opposition.

28   Consequently, the Court analyzes the conduct with respect to the sexual harassment and assault
     claims together under Title VII.

09cv2469

1991).  A hostile work environment occurs "when the workplace is permeated with
discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive working environment."  *Harris v.
Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477
U.S. 57, 65, 67 (1986)) (internal quotation marks and citations omitted).  To state a case of
hostile environment sexual harassment, a female plaintiff must allege "conduct which a
reasonable woman would consider sufficiently severe or pervasive to alter the conditions of
employment and create an abusive working environment."  *Ellison*, 924 F.2d at 879 (footnotes
omitted).

        The court uses a totality-of-the-circumstances test to determine if the working
environment is both subjectively and objectively perceived as abusive.  *Brooks*, 229 F.3d at 923.
The court looks at the frequency of discriminatory conduct, severity of the conduct, whether the
conduct is physically threatening or mere offensive words, and whether the conduct
unreasonably interferes with the employee's job performance.  *Id.* at 924 (citing *Ellison*, 924
F.2d at 879).  Title VII is not intended as a general civility code.  *Faragher v. City of Boca
Raton*, 524 U.S. 775, 788 (1998).  "[C]onduct must be extreme to amount to a change in the
terms and conditions of employment."  *Id.*  As such, "isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the 'terms and conditions of
employment.'"  *Id.*

        In *Brooks*, the Ninth Circuit found an incident between co-workers to be "highly
offensive" but not severe enough to alter the terms and conditions of the employee.  *Brooks*, 229
F.3d at 926.  The plaintiff, a female telephone dispatcher, alleged that a male senior dispatcher
forced his hand under the plaintiff's sweater and bra and fondled her breast.  *Id.* at 921.  The
plaintiff removed the senior dispatcher's hand and told him that he had "crossed the line."  *Id.*
The senior dispatcher approached the plaintiff again but stopped when another dispatcher arrived
on the scene.  *Id.*  The court held the conduct to be highly reprehensibly, but not actionable under
Title VII because an isolated incident with no precursors and never repeated could not be
considered to impose "onerous terms of employment for which Title VII offers a remedy."  *Id.* at

8

09cv2469

1    927.  However, the court noted that the outcome might have been different if the senior

2    dispatcher had been the plaintiff's supervisor rather than co-worker because a supervisor is

3    cloaked with authority, and sexual assault by a supervisor, even on a single occasion, may be

4    "sufficiently severe as to alter the conditions of employment." *Id.* at 927 n.9.

5         The Ninth Circuit discussed the difference between a management-level employee and a

6    co-worker for Title VII purposes further in *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir.

7    2001).  An employee may be considered as management for Title VII liability purposes in two

8    situations.  First, if he is a supervisor with substantial authority to change the conditions of the

9    harasser's or harassee's employment, such as the ability to counsel, investigate, suspend, or fire

10   the harasser.  *Swinton*, 270 F.3d at 804.  Second, if the supervisor has a "strong de facto duty to

11   act as a conduit to management for complaints about work conditions."  *Id.* at 805 (quoting

12   *Lamb v. Household Servs.*, 956 F. Supp. 1511, 1517 (N.D. Cal. 1997)).  The key when looking at

13   a one-time incident in determining if it may give rise to a hostile-work-environment claim is

14   whether the action, considering the authority the employer cloaks the harasser in, is "sufficiently

15   severe so as to alter the conditions of employment."  *Brooks*, 229 F.3d at 927 n.9.  The

16   distinction between manager and employee is not determined by mere title alone, rather it is

17   determined by whether or not the individual has the "authority to demand obedience from an

18   employee.  *Dawson v. Entek Int'l*, 630 F.3d 928, 940 (9th Cir. 2011) (internal citations omitted).

19        Here, Mr. Aguilera's conduct was highly offensive and reprehensible; however, the

20   conduct was not severe or pervasive enough to create a hostile environment to support a Title

21   VII claim.  Even taking Plaintiff's alleged facts as true for the sake of argument, the isolated

22   incident is less severe than what occurred in *Brooks*.

23        To show the severity of the conduct, Plaintiff alleges that Mr. Aguilera looked down her

24   shirt while she put on her shoes, said to Plaintiff, "let me see if you have milk in there [her

25   breasts]," touched Plaintiff's chest near her breast, then lifted up Plaintiff's shirt and pulled on

26   the waist of her pants to take an unwelcome picture of Plaintiff's pregnant stomach.  Like the

27   harassment in *Brooks*, this was an isolated incident, which unless extremely serious cannot give

28   rise to a hostile environment claim.  *See Brooks*, 229 F.3d at 924; *Faragher*, 524 U.S. at 788.  In

09cv2469

*Brooks*, the court did not find a hostile environment despite conduct more outrageous than what is present here. *See Brooks*, 229 F.3d at 927. The harasser in *Brooks* reached under the victim's sweater and bra to fondle her breast. *Id.* at 921. The victim verbally told the harasser that he had crossed the line, which did not deter the harasser from approaching the victim again until another employee arrived on the scene. *Id.* Here, although Plaintiff states that the encounter was unwelcome, she did not verbally object nor did Mr. Aguilera go so far as to fondle Plaintiff's breast under her shirt. Additionally, unlike the victim in *Brooks*, Plaintiff in this case did not require an immediate leave of absence or psychological care. *See id.* at 922. Consequently, even as alleged by Plaintiff, the conduct itself is less severe than what occurred in *Brooks*. *See id.* at 927.

The remaining facts similarly show that like in *Brooks*, Plaintiff could not reasonably feel that the harassment altered the conditions of her employment because she cannot show that she reasonably feared that she would be subject to misconduct in the future. *See Brooks*, 229 F.3d at 924. Like the employer in *Brooks*, Mr. Aguilera could not become bolder and attempt further harassing acts because the commissary transferred him from the workplace and filed a letter of concern with Mr. Aguilera despite the CID concluding it would not charge Mr. Aguilera with any offense. Additionally, Plaintiff has not produced any facts showing that she reasonably feared any further harassment.

Plaintiff cannot distinguish *Brooks* by simply claiming that Mr. Aguilera was her supervisor in this situation. Mr. Aguilera is not a management-level employee for Title VII purposes. Plaintiff argues that Mr. Aguilera was her supervisor because as the QAE present at the time of the incident, with no other manager on the premises, Mr. Aguilera was the acting manager in charge of the facility. (Pl.'s Opp'n 13:22–15:13.) Plaintiff relies on Rubin Barcelona's deposition testimony that states Mr. Aguilera is the "acting store manager" if no other department managers are on the premises. (*Id.*; Barcelona Dep. 36:2–24.) However, Plaintiff's argument fails for at least two reasons: (1) Plaintiff does not provide any legal support for its argument that the highest ranking employee on the premises is a management-level employee for Title VII purposes; and (2) Plaintiff does not put forth any evidence showing that

09cv2469

1  Mr. Aguilera either had the authority to change the conditions of Plaintiff's work environment or

2  had a strong *de facto* duty to report any harassment complaints to management.

3      Mr. Aguilera did not have the authority of a management-level employee under Title VII.

4  Even as the QAE on the premises with no other managers on site, Mr. Aguilar did not have

5  power to hire, fire, and discipline any employees, or even to recommend such actions to

6  management.  (Vick Decl. ¶ 4; Vick Dep. 72:3–74:8.)  As the acting "manager" at nighttime in

7  the absence of other department managers, Mr. Aguilera was in charge of the building security

8  and monitoring the performance of stocking and custodial contractors.  (*Id.*)  Additionally, Mr.

9  Aguilera did not have any responsibility over employment-related complaints other than to pass

10  them along to management as would any other employee.  (*Id.*)  Despite any title Mr. Aguilera

11  had when no other managers were on site, Mr. Aguilera was not a supervisor for Title VII

12  purposes because he did not have authority over Plaintiff, or the ability to change the terms of

13  her employment.  *See Dawson*, 630 F.3d at 940; *Swinton* 270 F.3d at 804.[3]

14      Additionally, Plaintiff points to an additional allegation by another commissary employee

15  that Mr. Aguilera grabbed her breasts.  However, according to Plaintiff's allegations, this

16  information did not come up until the CID's investigation following the incident with Plaintiff.

17  Therefore, Plaintiff cannot rely on this alleged misconduct which she was unaware of at the time

18  of the incident because it "has no bearing on whether she reasonably considered her working

19  environment abusive."  *Brooks*, 229 F.3d at 924.

20      Although unacceptable and offensive, the isolated incident does not show a situation that

21  the Court could reasonably find severe enough to alter the terms or conditions of Plaintiff's

22  employment.  *See Brooks*, 229 F.3d at 927.  Consequently, Plaintiff does not have an actionable

23  Title VII claim for sexual discrimination because the allegations do not show a hostile work

24

25

26      [3] In unusual cases, an individual may be considered the victim's supervisor if he gives the

27  victim the false impression that he is one, provided that the victim's mistaken conclusion is
reasonable.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998).  However, Plaintiff

28  does not argue this, and nonetheless, any such mistake would not seem reasonable.  *See id.*

09cv2469

1  environment, and Plaintiff fails to present any allegations of quid pro quo harassment.[4]

2

3  **B.  Retaliation/Reprisal**

4  Title VII additionally prohibits retaliation against an employee who engages in a

5  protected activity. *Nilsson v. City of Mesa*, 503 F.3d 947, 953 (9th Cir. 2007).  "To establish a

6  case of retaliation, a plaintiff must prove that (1) she engaged in a protected activity, (2) the

7  plaintiff suffered an adverse employment action, and (3) there was a causal link between the

8  plaintiff's protected activity and the adverse employment action." *Poland v. Chertoff*, 494 F.3d

9  1174, 1179-80 (9th Cir. 2007).

10  Title VII is not a general civility code for the workplace and not every slight or minor

11  annoyance after an employee reports discriminatory behavior constitutes an adverse employment

12  action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  "A plaintiff must

13  show that a reasonable employee would have found the challenged action materially adverse,

14  which in [Title VII retaliation] context means it well might have dissuaded a reasonable worker

15  from making or supporting a charge of discrimination." *Id.* (internal citations omitted).  The

16  causal link between the adverse action and an employee's engagement in a protected activity is

17  generally inferred from the proximity in time between the protected action and the alleged

18  retaliatory action. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006)

19  (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).

20  If a plaintiff provides sufficient evidence to set forth a prima facie case, the burden shifts

21  to the employer "to articulate a legitimate, non-retaliatory reason for its actions." *Nilsson*, 503

22  F.3d at 954 (quoting *Porter v. Cal. Dep't of Corrections*, 419 F.3d 885, 894 (9th Cir. 2004)).  If

23

24  _____

25  [4] In support of the Title VII harassment claim, Plaintiff presents arguments that Defendant
is liable as a matter of law because it certified that Mr. Aguilera was acting in the scope of his
employment and that Defendant violated Title VII by failing to prevent the harassment.

26  However, scope of employment and negligence arguments are only theories used to hold an
employer liable for its employees actions. *See Ellerth*, 524 U.S. at 756-59. Here, there is no

27  actionable sexual harassment under Title VII and therefore, no need to discuss the Defendant's
liability. *See Brooks*, 229 F.3d at 927 n.10 ("[A]s there [is] no actionable sexual harassment,

28  there is no liability to assign.").

12

1  the employer sets forth such a reason, the burden shifts back to the plaintiff who "bears the

2  ultimate burden of submitting evidence indicating that the [employer's] proffered reason is

3  merely a pretext for a retaliatory motive." *Id.*  To show pretext, the Plaintiff must either offer

4  evidence—direct or circumstantial—that the discriminatory reason more likely than not

5  motivated the employer, or offer evidence that the employer's offered explanation "is unworthy

6  of credence." *Cornwell,* 439 F.3d at 1028 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450

7  U.S. 248, 256 (1981)).

8

9                    **1.      Prima Facie Case**

10      First, Plaintiff engaged in a protected activity when she complained about Mr. Aguiler's

11  actions.  Asserting one's civil rights by complaining about an alleged sexual harasser is a

12  protected activity under Title VII.  *Brooks*, 229 F.3d at 928.  Defendant does not dispute this.

13      Second, Plaintiff presents evidence that she suffered an adverse employment action.

14  Plaintiff alleges she was transferred to the position of cashier which she did not favor; the

15  commissary refused to provide her with a footstool and chair as she requested; management

16  nitpicked about her work and disciplined her in writing for talking to a bagger; and creation of a

17  hostile retaliatory environment shown by Mr. Barcelona and Ms. Mina continuing to be friends

18  with Mr. Aguilera and putting a "spotlight" on Plaintiff.  However, only some of these actions

19  are reasonably and materially adverse employment actions.

20      Plaintiff's transfer to the cashier position that she disfavored and the negative work write-

21  up are sufficient allegations for a prima facie showing of an adverse action.  Plaintiff viewed the

22  cashier position as hostile and preferred her position in the produce department, so a transfer

23  against her wishes can be viewed as an adverse action.  *See Yartzoff,* 809 F.2d at 1376 (stating

24  that transfers of job duties may constitute an adverse employment decision); *see also White*, 548

25  U.S. at 70-71 (noting that different job categories inevitably involve some responsibilities and

26  duties that may be less desirable than others; a good way to discourage employees from bringing

27  charges is to transfer complaining employees to the less desirable positions).  Also, the written

28  discipline of Plaintiff could be considered an adverse action as it is akin to a poor-performance

09cv2469

1    rating.  *See Yartzoff*, 809 F.2d at 1376 (undeserved performance ratings may constitute an

2    adverse employment decision).

3           However, Plaintiff's remaining allegations do not fall within the category of adverse

4    employment actions.  Even if Mr. Barcelona and Ms. Mina continued to be friends with Mr.

5    Aguilera, such a relationship without anything more does not constitute a hostile work

6    environment.  *See Brooks*, 229 F.3d at 929 (finding that a victim of sexual harassment is not

7    entitled to avoid contact with the harasser's friends and the indication of adverse conduct must

8    be outward signs of hostility).  Additionally, Ms. Mina's response to Plaintiff's request for a

9    footstool and chair did not amount to an adverse action.  Though Ms. Mina initially requested a

10   doctor's note per commissary policy, ultimately she accommodated the request and also offered

11   Plaintiff a position of ID checker so she could sit down.  Such actions did not single Plaintiff out

12   and would not reasonably dissuade any employee from making a complaint.  *See Brooks*, 229

13   F.3d at 929-30 (finding that, first, requiring a harassment victim to attend group therapy sessions

14   was not an adverse action because all employees were required to participate and, second,

15   adverse action does not exist when an employer accommodates the employee's requests).

16   Lastly, Plaintiff does not provide adequate evidence to support a retaliation claim through

17   "nitpicking" and creation of a hostile work environment.  The undisputed evidence shows that

18   Plaintiff was not subjected to any derogatory remarks or actions severe enough to affect her

19   work conditions.  *See Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000) (quoting *Strother

20   v. S. Cal. Permanente Med. Grp*, 79 F.3d 859, 869 (9th Cir. 1996)) (holding that harassment

21   must be sufficiently severe or pervasive to change the terms of employment, and "mere

22   ostracism in the workplace is not enough to show an adverse employment decision").

23          Third, the causal link between the protected activity and the alleged retaliatory actions

24   may be inferred from the proximity in time between the two in this case.  The incident took place

25   on August, 24, 2008 and the initial transfer to the cashier position occurred less than three

26   months later in October 2008.  The proximity between the two events is sufficient to satisfy the

27   causal-link element.  *See Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1226 (9th. Cir. 2012)

28   (quoting *Poland*, 494 F.3d at 1180 n.2) ("[T]he causal link element is construed broadly" at the

09cv2469

prima facie stage so that a plaintiff merely has to prove the actions are not completely unrelated). Therefore, the Plaintiff produced sufficient evidence to create a prima facie showing of retaliation regarding some of the employment actions taken.

### 2.     Defendant's Non-retaliatory Reasons for Its Actions

In response to Plaintiff's prima facie showing, Defendant presents sufficient legitimate non-retaliatory reasons for its actions to rebut the allegations of retaliation.  First, Defendant justified Plaintiff's reassignment to the cashier position by noting her inability to continue performing the duties required of her in the produce department.  (Milano Dep. 122:4–24.)  The produce position required a lot of lifting, which Plaintiff was unable to do given her stage of pregnancy.  (*Id.*)  Second, Defendant notes and Plaintiff concedes that she in fact talked to a bagger thereby violating a store policy.  (*Id.* at 156:1–6.)  And documenting such infractions of commissary policy just followed a store directive.  (Mina Dep. 40:2–43:6.)   Additionally, Plaintiff was neither suspended nor did she lose pay for the incident.  (*Id.*)  Producing such evidence meets the Defendant's burden to show that its actions were not motivated by discriminatory animus.  *See Yartzoff*, 809 F.2d at 1376-77 (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 737 (9th Cir. 1986)) ("[T]he [employer] 'need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'").

### 3.     Plaintiff's Evidence of the Defendant's Pretext

Plaintiff offers no evidence to show that the Defendant's offered explanations are unworthy of credence and are simply pretext for racial discrimination.  Although Plaintiff may rely on circumstantial evidence to show pretext, such a showing "must be 'specific' and 'substantial' to create a genuine issue of material fact."  *Cornwell*, 439 F.3d at 1029 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).  Because Plaintiff offers no such evidence in response to Defendant's proffered nondiscriminatory reasons, the Court grants Defendant's motion as to Plaintiff's retaliation claim.

09cv2469

1

**C.      Negligent Hiring, Training, Supervision, Investigation and/or Retention**

2      Plaintiff argues that Defendant was negligent in failing to provide Mr. Aguilera with

3   sexual-harassment training prior to August 2008.  Plaintiff relies on the Supreme Court's opinion

4   in *Faragher* to support her Title VII claim for Defendant's failure to take reasonable efforts to

5   prevent harassment in the workplace before it occurs.  In *Faragher*, the Supreme Court discusses

6   possible issues of liability for employers in the event actionable harassment under Title VII

7   occurs.  *See Faragher*, 524 U.S. at 807 (adopting standards of vicarious liability for an employer

8   for an *actionable* hostile environment).  However, as shown above, because the alleged actions

9   were not severe or pervasive enough to reasonably alter the conditions of Plaintiff's

10  employment, no actionable Title VII harassment exists.  Therefore, the Court also grants

11  Defendant's motion as to Plaintiff's negligence claim under Title VII.

12

13  **IV.    CONCLUSION & ORDER**

14      For the forgoing reasons, the Court **GRANTS** Defendant's motion for summary

15  judgment.  (Doc. 41.)  The Court also **DENIES AS MOOT** the parties' joint motion to continue

16  pretrial dates.  (Doc. 60.)  The Clerk of the Court shall enter judgment in accordance with this

17  order.

18      **IT IS SO ORDERED.**

19

20  DATED: March 7, 2013

21                                                      _____

22                                                      M. James Lorenz
                                                        United States District Court Judge

23  COPY TO:

24  HON. BARBARA LYNN MAJOR
    UNITED STATES MAGISTRATE JUDGE

25

26  ALL PARTIES/COUNSEL

27

28

09cv2469